**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HSF HOLDING, INC., et al., | ) |
| | ) Case No. 09-11901 (PJW) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## MEMORANDUM OPINION

David B. Stratton
Evelyn J. Meltzer
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

Leon R. Barson
Nina M. Varughese
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Attorneys for the Debtors
and Debtors in Possession

Adam Hiller
Donna Harris
Pinckney, Harris & Weidinger, LLC
1220 North Market Street
Suite 950
Wilmington, DE 19801

Craig A. Wolfe
Robert S. Friedman
Eric B. Post
Benjamin Blaustein
Sarah K. Kam
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Domenic E. Pacitti
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062

Henry Callaway
Hand Arendall LLC
11 North Water Street
RSA Battle House Tower
Suite 30020
Mobile, AL 36602

Counsel to Austal USA, LLC

Tony West
Assistant Attorney General

David Weiss
Acting United States Attorney

Ellen W. Slights
Assistant United States
Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046

Counsel to The Official
Committee of Unsecured
Creditors of HSF Holding,
Inc., et al.

J. Christopher Kohn
Tracy J. Whitaker
Mary A. Schmergel
Rodney A. Morris
Commercial Litigation Branch
Civil Division
United States Department of
Justice
P.O. Box 875
Ben Franklin Station
Washington, D.C.  20044

Attorneys for United States
Department of Transportation
Maritime Administration

Dated: January 13, 2010

**WALSH, J** ~~P. Walsh~~

      This opinion is with respect to the motion brought by HSF Holding, Inc. ("HSF") and Hawaii Superferry, Inc. ("Superferry" and collectively with HSF, the "Debtors"), pursuant to 11 U.S.C. §§ 105(a) and 554(a), for entry of an order approving abandonment of Debtors' estates' interests in a spare main engine (the "Spare Main Engine"). (Doc. # 111.)  For the reasons discussed below, I will grant the motion.

**BACKGROUND**

      The Court's detailed relevant facts set forth below are as stipulated to by the parties in the Joint Statement of Facts and an amendment thereto.  (Doc. ## 255 and 271.)

      On April 9, 2004, the Debtors entered into two separate shipbuilding contracts with Austal USA, LLC ("Austal") for the construction of two 105 meter high-speed passenger and vehicle ferries, the "Alakai" (the "Alakai Shipbuilding Contract") and the "Huakai" (the "Huakai Shipbuilding Contract").  On or about October 26, 2005, the parties amended the Huakai Shipbuilding Contract to include the delivery of the Spare Main Engine with the Alakai.  The parties intended to use the Spare Main Engine on the Alakai or the Huakai.  The Spare Main Engine and the main engines on the Alakai and Huakai were manufactured in Germany by special order and were not available from stock.

In October 2005, the United States Department of Transportation's Maritime Administration ("MARAD") guaranteed the financing facility for the construction of the Alakai and the Huakai (each a "Vessel" and collectively, the "Vessels"). As a guarantor, MARAD, among other things, received a promissory note and entered into a MARAD Security Agreement, as amended and restated, with Superferry. Pursuant to the MARAD Security Agreement, Superferry agreed to "grant, sell, convey, assign, transfer, mortgage, pledge, set over and confirm" to MARAD a "continuing security interest in all the right, title and interest" it had in certain collateral "whether now owned or existing hereafter arising or acquired." The collateral included, in relevant part, all of Superferry's interest in the Alakai Shipbuilding Contract, the Huakai Shipbuilding Contract (collectively, the "Shipbuilding Contracts") and "[c]ommencing on the Delivery Date of each Vessel, all goods, whether equipment or inventory appertaining to or relating to such Vessel, whether or not on board or ashore and not covered by [MARAD's Preferred Mortgage]...." The Huakai Shipbuilding Contract was amended on October 26, 2005, to require Austal to deliver the Spare Main Engine to Superferry with the delivery of the Alakai.

During the construction of the Alakai and the Huakai, Austal retained ownership of the Vessels and their "Components." The term "Components" included "everything which forms or is

intended to form part of the Vessel or to be placed in or on the Vessel and...includes the hull, engines, machinery, appliances, appurtenances, equipment, gear, [and] fittings...."

However, during the construction of the Vessels, Austal agreed to give a "first priority lien on, and a security interest in, the Vessel" to "a collateral trustee to hold on behalf of the [Superferry], MARAD and the financial institution [ABN Amro Bank N.V.] providing the Refund Guarantees...."

In accordance with the Shipbuilding Contracts, among other things, the collateral trustee, Wilmington Trust Company, on October 27, 2005 filed the UCC-1 financing statement (the "10-27-05 UCC-1") giving MARAD (ahead of Superferry and the ABN Amro Bank N.V.) a first priority security interest in all of Austal's "right, title and interest in and to the Collateral...under the [Shipbuilding] Contracts."  The 10-27-05 UCC-1 expressly provided that the term "collateral" includes

> "any and all present and future materials, components, engines, boilers, machinery...*spare and replacement parts*...installed or to be installed on the Vessels....and any and all other appurtenances thereto, appertaining or belonging to the Vessels, whether now or hereafter acquired, and whether onboard or later to be onboard....The Collateral also includes any and all present and future rights to any proceeds derived or to be derived from...appropriation and other disposition of the Collateral."

(Doc. # 255, ex. D)(emphasis added).

Further, once the MARAD Security Agreement was executed, MARAD on October 28, 2005 filed the UCC-1 financing statement (the "10-28-05 UCC-1") perfecting MARAD's security interest in, among other things, "[a]ll of [Superferry's] right, title and interest in and to....(1) the Shipbuilding Contract[s] dated April 9, 2004, as amended from time to time,...for the construction of [the Vessels], together with all other contracts, whether now in existence or hereafter entered into, relating to the construction of the Vessels....[and](12)[a]ll proceeds of the collateral described...above." Thus, pursuant to the 10-27-05 UCC-1 and the 10-28-05 UCC-1 (which explicitly covered spare and replacement parts, as well as the Shipbuilding Contracts), MARAD had a perfected security interest in the Vessels.

On May 30, 2007, Austal delivered the Alakai and the Spare Main Engine to Superferry and contemporaneously executed a Preferred Mortgage in MARAD's favor that was recorded the same day with the United States Coast Guard National Vessel Documentation Center (the "National Documentation Center"). MARAD's Preferred Mortgage provides, in relevant part:

> [Superferry] has granted, conveyed, mortgaged, pledged, confirmed, assigned, transferred and set over, and by these presents does grant, convey, mortgage, pledge, confirm, assign, transfer and set over unto [MARAD] a one hundred percent interest in the whole of the [Alakai], which is more fully described in its certificate of documentation, together with all of its boilers, **engines**, machinery, masts, **spares**, rigging, boats, anchors, cables,

> chains,  tackle,  tools,  pumps  and  pumping
> equipment,  apparel,  furniture,  fittings,  and
> equipment,  **spare parts**  and  all  other
> appurtenances  to  the  [Alakai]  appertaining  or
> belonging,  **whether now owned or hereafter
> acquired whether on board or not**  and  all
> additions,  improvements,  renewals  and
> replacements  hereafter  made  in  or  to  the
> [Alakai]  or  said  appurtenances.

(Emphasis added).

The  Preferred  Mortgage,  which  incorporated  the  MARAD  Security
Agreement,  also  covers  the  Huakai  and  specifically  states  that  the
amount  of  the  debt  covered  by  the  Preferred  Mortgage  is
$139,731,000,  which  is  the  amount  MARAD  guaranteed  for  the
financing  of  both  Vessels.

Superferry  put  the  Alakai  into  operation  in  August  2007,
and  used  it  to  transport  passengers  and  vehicles  between  the
Hawaiian  islands  until  March  2009.    Superferry  purchased  the  Spare
Main  Engine  and  brought  it  to  Hawaii  to  minimize  downtime  if  one  of
the  Alakai's  main  engines  failed  and  had  to  be  replaced.
Superferry  also  intended  to  use  the  Spare  Main  Engine  on  the  Huakai
if  one  of  its  main  engines  failed  after  that  Vessel  was  placed  into
service.    This  would  permit  Superferry  to  provide  high  speed  ferry
service  with  minimal  disruption.    Between  August  2007  and  March
2009,  the  Alakai  was  the  only  vessel  in  operation  by  Superferry  on
which  the  Spare  Main  Engine  could  be  used.    The  Huakai  was  never
put  into  service  by  Superferry.

On March 16, 2009, the Supreme Court of Hawaii held that a state law allowing the Debtors to operate without completing an environmental impact study was unconstitutional, and as a result the Debtors were forced to cease operations. (Doc. # 3.)  Shortly thereafter, the Debtors sent the Alakai back to Mobile, Alabama, while the Spare Main Engine remained in Hawaii.  (Doc. # 255.)  The Spare Main Engine was never used or installed on either of the two vessels.  On April 21, 2009, Superferry accepted the delivery of the Huakai at Austal's shipyard in Mobile, Alabama, but never placed the vessel into service.  Up through the petition date the Huakai remained docked at Austal's facilities in Mobile, Alabama.

On May 30, 2009, HSF and Superferry each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On July 1, 2009, this Court entered an order granting the Debtors' motion to abandon the Alakai and the Huakai.

On June 30, 2009, the Debtors filed a motion for entry of an order approving abandonment of the Debtors' estates' interests in the Spare Main Engine.  (Doc. # 111.)  The Debtors argue that the Spare Main Engine is of inconsequential value and benefit to the Debtors' estate because any value obtained by the estate would not be distributed to the general unsecured creditors but instead would inure to the benefit of MARAD, who asserts first priority preferred ship mortgages against the Vessels.  Austal and MARAD

filed briefs in support of the Debtors' Motion.[1] (Doc. ## 293 and 294.)

The Official Committee of Unsecured Creditors (the "Committee") filed a brief in opposition to the Debtor's motion. (Doc. # 321.)  The Committee argues that neither Austal nor MARAD held perfected security interests in the Spare Main Engine as of the petition date.  The Committee relies on two main arguments. First, it contends that the only way that the Spare Main Engine could have been perfected is if the Spare Main Engine was deemed an appurtenance to either the Alakai or the Huakai, but not both.  The Committee argues that the Spare Main Engine was not an appurtenance to either of the two vessels, and was therefore not covered by the Preferred Mortgages.  Second, the Committee argues that contrary to MARAD's position the Spare Main Engine cannot be deemed a "proceed" of the Huakai Shipbuilding Contract.

## JURISDICTION

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.  The predicate for the relief are 11 U.S.C. §§ 105(a) and 554(a), and Bankruptcy Rule 6007.

---

[1] As a result of the Debtors' failure to make the final payment to Austal for the Huakai vessel, the Debtors gave Austal a promissory note in the amount of $1,622,109.  MARAD agreed to subordinate its security interest in the Spare Main Engine to the extent of Austal's $1,622,109 obligation.

**DISCUSSION**

To preserve the nation's capacity to build ships, Congress has long maintained a statutory program by which the United States guarantees ship construction financing to encourage investment in the industry.  See Title XI of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. Chapter 537 ("Title XI").  As a condition to receiving such guarantee, the United States must retain a security interest, which may include a mortgage, on the vessel(s).  See 46 U.S.C.A. § 53711.  The mortgage so authorized is defined by the statute to be "a mortgage on a vessel that will become a preferred mortgage when filed or recorded under chapter 313 of this title."  46 U.S.C.A. § 53702.  Accordingly, under this statutory scheme, MARAD, as part of its delegated duties from the Secretary of Transportation, generally places a first preferred mortgage lien on all vessels financed under Title XI.

Under 46 U.S.C.A. § 31322, a "preferred mortgage" is a mortgage that: "(1) includes the whole of the vessel; (2) is filed in substantial compliance with section 31321 of this title; [and] (3)(A) covers a documented vessel."  To determine what type of property may be covered by a preferred ship mortgage, it is necessary to define what constitutes a vessel.  Courts have interpreted that "[t]he term 'vessel' includes its apparel and appurtenances." Gonzalez v. M/V Destiny Panama, 102 F.Supp.2d 1352, 1354 (S.D. Fla. 2000) (quoting T.A. Russell, 2 Benedict on

Admiralty § 32 at 3-3 (1999) (internal quotations omitted); see
e.g., Kesselring v. F/T/ Arctic Hero, 30 F.3d 1123, 1125-26 (3rd
Cir. 1994)(finding that the "test . . . in accord with all reported
court and scholarly authority" for determining whether leased
equipment is subject to a maritime wage lien, is whether such
equipment is appurtenant and essential to the navigation and
operation of a vessel). Given this standard, the first issue in
this case is whether the Spare Main Engine constitutes an
appurtenance to the Alakai.

The Spare Main Engine An Appurtenance to the Alakai

Under the United States Commercial Instruments and
Maritime Liens Act, 46 U.S.C. § 31301 et seq. (the "CIMLA"), a
preferred ship mortgage is considered a lien on the mortgaged
vessel in the amount of the outstanding mortgage indebtedness
secured by such vessel. 46 U.S.C. § 31325(a). The Third Circuit
"agree[s] that a valid preferred ship mortgage prevails over all
non-maritime liens" and "that a ship mortgage is valid against
third parties when properly filed for recordation with the
[National Documentation Center] and retained by it in a manner that
permits diligent prospective creditors to learn of the mortgage's
pre-existing lien on the mortgaged vessel." In re Alberto, 823
F.2d 712, 721-22 (3rd Cir. 1987). In other words, once a mortgage
is recorded with the National Documentation Center and such
mortgage is endorsed upon the vessel's documents, it is properly

perfected.  Id.; see Morse Drydock & Repair Co. V. S.S. Northern Star, 271 U.S. 552, 554 (1926); Jackson v. Inland Oil & Transport Co., 318 F.2d 802, 809-10 (5th Cir. 1963).  Otherwise, "[t]o permit state law to govern security interests in federally documented vessels would undermine the congressional intent reflected in [46 U.S.C. § 31321] that a federal registry be established to which a diligent prospective creditor may resort to determine the status of a vessel's title." 823 F.2d at 716.

MARAD's Preferred Mortgage was properly filed, recorded and endorsed with the National Documentation Center on May 30, 2007.  As such, MARAD has a perfected mortgage on the Alakai as of May 30, 2009.  This Preferred Mortgage explicitly covers, among other things, the Alakai's "engines," "spares" and "spare parts." These items were covered whether owned or acquired after the Preferred Mortgage became perfected and "whether on board or not."

There is no dispute that documents must be interpreted "in accord with their plain language."  Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 249 (3rd Cir. 2007). In this case, the Spare Main Engine was delivered to Superferry with the Alakai on the same day that MARAD's Preferred Mortgage was perfected.  The mortgage clearly states that Superferry grants 100% interest to MARAD in any (i) spare or spare part and (ii) engines for the Alakai.  Thus, under the plain language of MARAD's Preferred Mortgage, any spare engine or spare part meant for the

Alakai, including the Spare Main Engine, would be subject to such mortgage.

However, notwithstanding that it concedes that "each item encumbered by [MARAD's Preferred Mortgage] does not need to be specifically named in the preferred mortgage," (Doc. # 195 at ¶ 13) the Committee takes the position that the only way the Preferred Mortgages could have perfected a security interest in the Spare Main Engine is if the Spare Main Engine is deemed to have been an appurtenance of one specific vessel, either the Alakai or the Huakai, but not both. The Committee offers the following in support of its position:

> "[A]n appurtenance is [(1)] any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and [(2)] is essential to the vessel's navigation, operation, or mission." Gonzales [sic] v. M/V Destiny Panama, 102 F. Supp. 2d 1352, 1356 (S.D. Fla. 2000). This definition of appurtenance is the prevailing one and it has been followed by various circuit courts of appeal. See, e.g., Scott v. Trump Ind., Inc., 337 F.3d 939 (7th Cir. 2003); Anderson v. United States, 317 F.3d 1235 (11th Cir. 2003). Contrary to Austal and MARAD's unsupported assertions, items that are part of an inventory of spare parts intended for use on a fleet of vessels are not appurtenances. See Stewart, 890 F.Supp. at 562.

(Doc. # 321, p. 14.)

The Committee takes the position that the quoted statement from the Gonzalez decision means that the identifiable item can be an appurtenance only if destined for use aboard one

specifically identifiable vessel.  If that is what the <u>Gonzalez</u> statement means, then I find the quoted statement from <u>Gonzalez</u> to be of questionable validity.  That quoted statement is the third sentence in a paragraph in which the first sentence of that paragraph is linked to the third sentence.  Specifically, the <u>Gonzalez</u> court said:

> A general rule for determining whether a particular item is an appurtenance can be synthesized from the <u>reasoning set forth in the foregoing cases</u>.  Neither installation, location, nor ownership is dispositive of the matter.  Rather, an appurtenance is any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation, operation, or mission.

102 F.Supp 2d. at 1356 (emphasis added).

However, a reading of the "foregoing cases" reveals that none of them supports the proposition in the third sentence of the paragraph that only a specifically identifiable item that is destined for use aboard one specifically identified vessel can be an appurtenance.  Indeed, one of the "foregoing cases", <u>Stewart & Stevenson Serv. v. M/V Chris Way MacMillan</u>, 890 F.Supp. 552, 561-62 (N.D.Miss. 1995), reached a result consistent with the result I reach here.  The case involved spare parts that could be utilized on two vessels in the fleet and which the court found became appurtenances to the vessel that was the subject of a preferred ship mortgage.  The two vessels were the "Chris Way" and the "Donald Cargill".  The Chris Way sank in a harbor outside of New

Orleans.   The  owner  was  advised  that  the  vessel  could  not  be
economically  refurbished  and  put  back  into  service.   The  owner  was
also  advised  that  certain  components  and  equipment  of  the  Chris  Way
could  be  utilized  as  spare  parts  for  other  vessels  owned  by  the
owner.   Pursuant  to  that  advice,  the  owner  removed  propellers  and
tail  shafts  from  the  Chris  Way.   The  <u>Stewart</u>  opinion  goes  on  as
follows:

> At  the  time  of  the  sinking  of  the  Chris
> Way,  Hugh  Mac  owned  and  operated  five
> towboats,  including  the  Chris  Way.   One  of
> them  was  the  M/V  Donald  Cargill  MacMillan,  a
> sister  ship  of  the  Chris  Way,  which  was  in  all
> significant  respects  identical  to  the  Chris
> Way.   The  Chris  Way  and  the  Donald  Cargill
> utilized  identical  propellers  and  tail  shafts,
> so  that  such  components  taken  from  one  ship
> could  be  used  in  the  other.
>
> *  *  *
>
> After  the  propellers  and  tail  shafts  were
> removed  from  the  Chris  Way  they  were
> considered  by  Hugh  Mac  to  be  part  of  its  spare
> parts  inventory  .  .  .  .
>
> As  matters  stood  at  that  time,  Hugh  Mac
> had  in  its  spare  parts  inventory  three
> propellers  and  three  tail  shafts  which  could
> fit  the  Donald  Cargill  .  .  .,  two  at  Louisiana
> Dry  Dock  and  one  at  Bollinger  Shipyard.
> However,  it  never  became  necessary  to  install
> any  of  those  propellers  or  shafts  on  the
> Donald  Cargill.   Meanwhile,  the  Chris  Way
> remained  at  Louisiana  Dry  Dock,  as  did  the
> propellers  and  shafts  which  had  been  removed
> from  her.

890  F.Supp.  at  559-60.

Later, Hugh Mac determined that the Chris Way could be refurbished
and made operational.  Thus, the owner sent two propellers and one
tail shaft to the dry dock location where the Chris Way was being
refurbished.  On these facts, the court concluded:

> What legal consequences flow from those
> facts?  The court holds that, as between
> plaintiff and Hugh Mac, from the time the two
> propellers and tail shafts now in the
> possession of plaintiff were delivered to
> plaintiff by Hugh Mac with the intent and
> purpose of incorporating them in the repaired
> and repowered . . . Chris Way . . . they
> became appurtenances of the vessel and thus
> subject to the lien of the preferred ship
> mortgage.

Id. at 561.

Thus, in Stewart the court found that spare parts of a
vessel, even if they may fit another vessel in the owner's fleet,
can still be appurtenant to the vessel subject to a preferred ship
mortgage.

The other two cases cited by the Committee, Anderson v.
United States, 317 F.3d 1235 (11th Cir. 2003) and (Scott v. Trump
Indiana, Inc., 337 F.3d 939 (7th Cir. 2003), are not very helpful
to its cause.

The result reached in the Anderson decision is
unremarkable and not helpful to the Committee's position.  In
Anderson, the plaintiff was injured when during a training mission,
an aircraft launched from the aircraft carrier USS Kennedy released
two bombs which missed their target and impacted near Anderson's

work site, thereby injuring him.  The court found that the aircraft
was assigned to the USS Kennedy and was housed on the ship, that
its operations were controlled by personnel aboard the USS Kennedy
at all times, and that, at the time Anderson was injured, the
aircraft was carrying out the USS Kennedy's mission.  317 F.3d at
944.  In finding that the aircraft was an appurtenance to the USS
Kennedy at the time of Anderson's injuries, the Anderson court
quoted from Gonzalez the same statement that the Committee quotes
from Gonzalez.  A statement that, as interpreted by the Committee,
I find is not supported by the "foregoing cases" relied upon by
Gonzalez.  In quoting Gonzalez, the Anderson court did not conclude
that the subject aircraft was destined for use only aboard one
specifically identifiable vessel, i.e., the aircraft carrier USS
Kennedy.  When the Anderson decision was decided in 2003 the United
States had nine, including USS Kennedy, active aircraft carriers.
See    The  US  Navy  Aircraft  Carriers,
[http://www.navy.mil/navydata/ships/carriers/cv-list.asp.](last
visited Jan. 8, 2010).  Indeed, in Anderson the plaintiff pointed
out that while the subject aircraft may have been an appurtenance
aboard the USS Kennedy at the time of the incident, it ceased to be
an appurtenance upon leaving the USS Kennedy.  In response, the
Anderson court pointed out that at the time Anderson was injured
the subject aircraft was carrying out the USS Kennedy's mission.
Thus, the court found that the aircraft was an appurtenance when it

released the bombs and injured Anderson.  Presumably, the subject aircraft became an appurtenance to another US aircraft carrier after it left the USS Kennedy.

In the <u>Scott</u> case, the plaintiff brought a personal injury action against the owner of a cruise ship and a truck crane rental company.  During an emergency drill, the staff of the cruise ship caused a life boat to be tossed overboard.  When the drill was finished, an independent crane operator was brought to the dock to lift the life boat out of the water.  A gust of wind blew the boat sideways and hit the plaintiff, causing serious injury.  While the court found that the life boat was an appurtenance to the cruise ship, it concluded that the injury was caused by the truck crane operator and the truck crane was not a vessel or an appurtenance to the vessel.  The truck crane was sitting on the dock.  The decision was easily made, but has no particular import here.  According to the court:

> [I]t is clear that the crane was not an appurtenance to the <u>Trump Casino</u>.  The crane was a completely land-based piece of equipment that was hired by Total Marine for one day. The fact that other vessels the size of the <u>Trump Casino</u> generally have a crane on-board is immaterial.  The crane in the present case was never aboard the <u>Trump Casino</u>.  It was not mounted on or in any way physically connected to the vessel.  Additionally, the crane was never under the control of <u>Trump Casino</u> personnel.  Total Marine hired Lola Crane, and Nichols drove the crane to the pier and operated it. . . .  The crane was not stored on board or a  part of the ship's usual gear, it was not attached to the ship in any way, it

> was not under the control of the <u>Trump Casino</u>
> or its crew, and Scott's injury did not occur
> aboard the ship or on its gangplank.

337 F.3d at 944.

Of significance here, I note that the court adopted the definition of an appurtenance as found in <u>Anderson</u>.  In doing so, it simply quoted <u>Anderson</u>'s quotation from <u>Gonzalez</u>.  Thus, since I find that the <u>Gonzalez</u> definition of an appurtenance, as interpreted by the Committee, is of questionable validity, the two cases that adopted that definition are of questionable support for the Committee's position.   Indeed, the facts in <u>Anderson</u> and <u>Scott</u> are so dissimilar to the facts here, they do not aid in the Committee's cause.

On the facts here, I find that the Spare Main Engine was an appurtenance to the Alakai.  Superferry took possession of the Alakai and the Spare Main Engine at the same time.  The Spare Main Engine was carried to Hawaii on the Alakai.  The Huakai did not even exist when the Spare Main Engine was put on board the Alakai to be sent to Hawaii and served as its appurtenance.  While Superferry took possession of the Huakai in Mobile, Alabama, the Huakai never traveled to Hawaii and never went into service as a fast ferry.  Thus, during the time between the delivery of the Alakai to Superferry and the termination of the Alakai's ferry service in Hawaii, the Spare Main Engine was a specifically identifiable item with respect to the Alakai, which was a

specifically identifiable vessel in service with a need for a spare main engine.  Between August 2007 and March 2009, the Alakai was the only vessel in operation by Superferry on which the Spare Main Engine could be used.  That the Spare Main Engine might later have become associated with the Huakai is irrelevant.  It did not become an appurtenance to the Huakai and that relationship may never happen.

The second prong of the appurtenance test requires the Spare Main Engine to be essential to the vessel's navigation, operation, or mission.  The Committee argues that because the Alakai had a fully functional main engine, the Spare Main Engine was not essential to the vessel's navigation.  I disagree.

In determining whether a certain tangible or intangible asset is necessary for a vessel's purpose, courts have considered whether the vessel's purpose would still be accomplished without such asset.  The Court in <u>Gowen, Inc. v. F/V Quality One</u>, 244 F.3d 64 (1st Cir. 2001), found that a fishing vessel's fishing permits contributed substantially to the vessel's value and its creditworthiness, and were therefore considered appurtenances of the vessel and subject to a maritime lien.  <u>See also</u> <u>The Augusta</u>, 15 F.2d 727, 727 (E.D.La. 1920) (finding that a wireless telegraph was appurtenant to the vessel, despite there being no law requiring its installation, because "In these days wireless telegraph apparatus is part of the usual equipment of all steamers. . . .");

<u>Motor-Services Hugo Stamp, Inc. v. M/V REGAL EMPRESS</u>, 165 Fed.Appx.
837, 840, 2006 WL 279241 at *3 (11th Cir. 2006)(finding that
"telecommunications and internet services aboard a luxury cruise
ship [are] essential to the vessel's mission.")  In the amendment
to the Joint Statement of Facts, all parties agreed that "HSF
purchased the Spare Main Engine . . . to minimize downtime if one
of Alakai's main engines failed . . . This would permit Superferry
to provide high speed ferry service with minimal interruption."
(Doc. # 271).  Given this undisputed fact, it is clear that the
Spare Main Engine was necessary to achieve Superferry's purpose of
uninterrupted high speed ferry service.  The Spare Main Engine was
essential to the vessel's mission, and thereby an appurtenance to
the Alakai.

          In an effort to separate the Alakai from the Spare Main
Engine, the Committee points to the fact that the Spare Main Engine
was covered by an insurance policy separate from the policy on the
Alakai and that when the Alakai was returned from Hawaii to Mobile,
Alabama, the Spare Main Engine was left in Hawaii.  However, the
Committee does not explain the "why" of these two facts.  With
respect to the separate insurance policy on the Spare Main Engine,
since that engine would spend most of its time on land, it may have
been cheaper to obtain a separate policy rather than tack it on to
the Alakai's insurance policy.  In other words, this fact could be
the result of a business judgment having no bearing on the matter

before me.  Likewise, the fact that the Spare Main Engine remained in Hawaii when the Alakai was taken back to Mobile, Alabama, does not suggest that it was not an appurtenance to the Alakai.  The high speed ferry service in Hawaii was finished.  In any event, we do not know why a Spare Main Engine remained in Hawaii or indeed who made the decision to leave it there.  Since MARAD was exercising its rights as a secured party, it may even have been its decision to leave the Spare Main Engine in Hawaii as a part of its strategy for liquidating its collateral.

The Spare Main Engine A Proceed of the Huakai Shipbuilding Contract

MARAD also contends that it perfected its security interest in the Spare Main Engine as a proceed under the Huakai Shipbuilding Contract when it filed its 10-28-05 UCC-1 financing statement.  The Committee argues that the Spare Main Engine does not qualify as a proceed under Hawaii law.  I disagree.

The term "proceeds" is defined in the Hawaii statutes as follows: "(1) Whatever is acquired upon the sale, lease, license, or other disposition of collateral; . . . (3) Rights arising out of collateral;" Haw. Stat. Ann. § 490:9-102 (West 2009).

The law further prescribes a limitation on "proceeds" requiring proceeds to be a type of collateral in which a security interest may be perfected by filing a financing statement. Haw. Stat. Ann. § 490:9-315(d)(1).  I will first address the limitation

and then I will turn to the analysis of whether the Spare Main Engine can be classified as "proceeds" using the above definition.

MARAD contends that the Spare Main Engine qualifies as equipment. The term "equipment" is defined as "goods other than inventory, farm products, or consumer goods." Haw. Stat. Ann. § 490:9-102. Although the Committee argues that proceeds and goods are mutually exclusive categories of collateral under the UCC, I disagree. The Official Comment to the UCC states:

> [A] security interest in proceeds remains perfected beyond the period of automatic perfection if a filed financing statement covers the original collateral (e.g., inventory) and the <u>proceeds are collateral in which a security interest may be perfected by filing in the office where the financing statement has been filed (e.g. equipment).</u>

UCC § 9-315 cmt. 5 (emphasis added).

The mentioning of "equipment" in the Official Comment makes it clear that the legislature contemplated that goods, which form the definition of "equipment", may be deemed proceeds. The Spare Main Engine, which is a good "other than inventory, farm products, or consumer goods" can be classified as equipment. Because equipment is of the type of collateral in which a security interest may be perfected by filing a financing statement, I now turn to the question of whether it qualifies as a proceed.

Prior to the current version of Article 9, the old definition of "proceeds" in Section 9-306(1) of the UCC was:

"[W]hatever is received upon the sale exchange, collection or other disposition of collateral or proceeds."   Julian B. McDonnell, Secured Transactions Under the Uniform Commercial Code, § 24.02 (2009).  This definition was amended to include the "Rights arising out of collateral" language.   Id. at § 1A.04.   The Committee, addressing this amendment and quoting only the commentator Julian B. McDonnell, states: "Commentators have warned that courts 'should be cautious not to extent [sic] the 'proceeds' category so far as to create 'surprise' interests in a debtor's assets not in some way disclosed by the collateral description in the security agreement.' Julian B. McDonnell, Secured Transactions Under the Uniform Commercial Code, § 24.03 (2009)." (Doc. #321, pp. 23-24.)  Although McDonnell does say that courts should be careful about the surprise interest, the entire context of this warning is as follows:

> [Courts] should be cautious not to extend the 'proceeds' category so far as to create 'surprise' interests in a debtor's assets not in some way disclosed by the collateral description in the security agreement.  In a provocative article Professor Jonathan C. Lipson argues that Revised § 9-102(a)(64) poses a particular risk of surprise proceeds interests with respect to security interests in information and other intellectual property.

McDonnell, Secured Transactions Under the Uniform Commercial Code, at § 24.03.

McDonnell uses information and intellectual property as examples of the types of "surprise interests" that might spring out

of the expanded definition of "proceeds". Both types are examples of intangible property, which the Spare Main Engine does not fall into. It is therefore a wide leap to assume that either the commentators or the drafters of the Code contemplated that extending a security interest to a spare main engine of a vessel equates to creating a "surprise interest" which overreaches the "Rights arising out of collateral" language of the statute.

The Committee contends that the 10-28-05 UCC-1 financing statement does not put other creditors on notice that a security interest in the Spare Main Engine is claimed, citing to In re Bollinger Corp., 614 F.2d 924 (3rd Cir. 1980). The issue in Bollinger was "Can a creditor assert a secured claim against the debtor when no formal security agreement was ever signed, but where various documents executed in connection with a loan evince an intent to create a security interest?" Id. at 925. To resolve the issue, the Court used the following standard:

> When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral.

614 F.2d at 928.

Although Bollinger affirms that to perfect a security interest other creditors must be put on notice, the court uses a lenient standard, which does not address the precise issue

presented in this case.  If at all applicable, the Bollinger standard supports MARAD's position.  Looking at the transaction as a whole — Superferry granting MARAD a security interest in the shipbuilding contracts of the Alakai and the Huakai and all goods or equipment relating to the vessels, and MARAD's filing of a UCC-1 on the same day as the execution of the security agreement, which covers all rights to the shipbuilding contracts — one may conclude that the Spare Main Engine, which can be classified as equipment, was intended to be covered by the security agreement and by the 10-28-05 UCC-1.

In In re Collated Products Corp., 121 B.R. 195 (D. Del. 1990), the Court recognized that term "proceeds" is broadly defined.  In that case, the debtor corporation was engaged in the business of manufacturing direct response card decks, which were advertisements sent by manufacturers to designated customers.  To place orders for goods, customers were required to prepay postage costs to the company, which the company then deposited into a commingled operating account.  The bank had a security interest in the debtor company's contractual right to postage payments by the customers.  The Court found that "[the definition of] proceeds includes 'whatever is received upon . . . disposition of the collateral'" and that "[a] customer's discharge of its obligation to provide the postage payments is a disposition of collateral. . . ." Id. at 204.

In the present case, Austal's delivery of the Spare Main Engine to Superferry discharged Austal's obligation under the Huakai Shipbuilding Contract.  Superferry received the Spare Main Engine in return for the discharged obligation, and thus the Spare Main Engine constitutes a proceed of the Huakai Shipbuilding Contract.

A security interest in a proceed is perfected "if the security interest in the original collateral was perfected." Haw. Stat. Ann. § 490:9-315(c).  In order to perfect interest in the original collateral, a party must file a financing statement for that collateral in the jurisdiction where the debtor is located. Haw. Stat. Ann. §§ 490:9-315(d)(1)(A), 490:9-301 & 490:9-310(a). Applying the law to the facts in this case, MARAD properly filed a UCC-1 financing statement with the State of Hawaii Bureau of Conveyances on October 28, 2005.  That filing perfected MARAD's interest in the Alakai and Huakai Shipbuilding Contracts, the original collateral.  Because MARAD perfected its interest in both shipbuilding contracts, it also perfected its interest in the contracts' proceed, the Spare Main Engine.

## CONCLUSION

For the reasons set forth above, the Debtors' motion for entry of an order approving abandonment of Debtors' estates' interests in the Spare Main Engine is granted.